NOT FOR PUBLICATION                                               (Doc. No. 17)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

|  |  |
|---|---|
| JOAN LANE, <br><br> Plaintiff, <br><br> v. <br><br> SEARS LOGISTICS SERVICES, INC., <br><br> Defendant. | Civil No. 11-6157 (RBK/KWM) <br><br> **OPINION** |

**KUGLER**, United States District Judge:

In this case, Plaintiff Joan Lane ("Plaintiff") asserts claims of gender discrimination, sexual harassment hostile work environment, and retaliation under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 *et seq.* ("NJLAD"), against her former employer, Defendant Sears Logistics Services, Inc. ("Defendant"). Currently before the Court is the Defendant's motion for summary judgment. (Doc. No. 17). For the reasons stated herein, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion.[1]

---

[1] As an initial matter, Plaintiff fails to oppose Defendant's motion for summary judgment with respect to her gender discrimination and retaliation claims. Accordingly, the Court will grant summary judgment in Defendant's favor on these claims. *See Daughtry v. Family Dollar Stores, Inc.*, No. 09-5111, 2011 WL 601270, at *8 (D.N.J. Aug. 5, 2011) (granting defendant summary judgment on NJLAD claim because plaintiff failed to respond to defendant's argument and thus waived claim) (citing *Player v. Motiva Enters. LLC*, 240 F. App'x 513, 522 n.4 (3d Cir. 2007)); *cf. Skirpan v. Pinnacle Health Hosps.*, No. 07-1730, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) (concluding that "[w]here a plaintiff has brought a cause of action which is challenged through [a] motion for summary judgment as legally insufficient, it is incumbent upon the plaintiff to affirmatively respond to the merits of a summary judgment motion" and noting that "a Plaintiff's failure to respond to arguments raised on summary judgment effectively constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues.").

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[2]

Plaintiff began her employment with Defendant in October 2009 as a Material Handler at Defendant's Swedesboro, New Jersey facility. (Defendant's Statement of Material Facts Not in Dispute ("Def.'s SMF") ¶¶ 4-5.) As a Material Handler, Plaintiff was responsible for checking in, putting away, and tagging merchandise, as well as putting parts together for merchandise. (*Id.* ¶ 6.)

As a new employee, Plaintiff received copies of Defendant's Code of Conduct and its Equal Employment Opportunity, Non-Harassment, and Affirmative Action policies. (*Id.* ¶¶ 7-8.) Plaintiff was aware that the Code of Conduct prohibited discrimination, harassment, and intimidation, and that Defendant's other policies prohibited harassment based on, *inter alia*, gender, sexual orientation, race, and ethnicity. (Pl.'s Dep. 60:20-61:2.) Plaintiff was also informed about Defendant's "reporting methods for associates who believe that improper conduct has occurred, including contacting one's supervisor, department manager, any company officer, human resources representative, the company's Office of Compliance and Ethics, and the Chief Compliance and Ethics Officer." (Def.'s SMF ¶ 10.) Defendant also maintained a toll-free hotline for employees to report any issues they may have regarding their employment. (*Id.* ¶ 11.)

At the start of her employment, Plaintiff was assigned to work the third shift. (*Id.* ¶ 14.) Louis Fine was employed by Defendant as a Material Handler Lead for the third shift. (*Id.* ¶ 15.) Plaintiff was the only female Material Handler on the floor. (Pl.'s Statement of Disputed Facts ("Pl.'s SF") ¶ 2; Deposition of Plaintiff Joan Lane 70:3-9, Dec. 6, 2012.) In early 2010, at some point after she began her employment, Plaintiff states that Mr. Fine engaged in the following

---

[2] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff. *See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

conduct: (1) he "called out of [her] name", i.e., Mr. Fine called Plaintiff a "bitch" and "dumb"; (2) he "invited Plaintiff to [his] penis"; (3) he stated that "[a]ll [Plaintiff] wants is my dick"; (4) he told her to "sit on [his] face"; (5) he made inappropriate sexual gestures towards her; and (6) on more than four occasions he would drop paperwork on the floor after she handed it to him. (Pl.'s Dep. 68:2-72:7; 75:10-23; 85:1-8; 99:14-102:4.) Plaintiff also testified that "quite a few times" she was not allowed to use "the good clamp trucks"[3] and that the keys would be taken out of those trucks so that she could not use them. (*Id.* 69:15-21.) Specifically, "I would come in and go to get a clamp truck to bring up front. They would take the keys out of it. Or if I did get a clamp truck, a newer clamp truck and brought it up to the front, then [Mr. Fine] would tell me, Oh, I'm taking this clamp truck[], get a different one. And by that time there was no good ones to run. There were older ones."[4] (*Id.* 88:4-15.)

Although the timing of Mr. Fine's conduct is not clear, Plaintiff testified that she reported the "name calling" to Mr. Victor Battagliotti in approximately June 2010, and that the majority of Mr. Fine's comments and actions occurred prior to this discussion. (Pl.'s Dep. 73:3-24; 77:2-24; 124:1-6.) Mr. Battagliotti instructed Plaintiff to make a report, which she left in his office. (*Id.* 73:21-74:14.) Plaintiff's report, dated July 1, 2010, provides:

> [Mr. Fine stated she] 'better fuckin do those papers wright [sic]', and that 'sometimes [Mr. Fine's] words towards me are a bit hard. I don't like being cursed at or called out of my name [BITCH] we talked about that an[d] he has not said that anymore', '[t]here has been other stuff said about 2 months ago when the temporal workers were here, [Louis Fine] said some real slick stuff to me in front of the temporal worker {that oh she want your body} I wasso embarrass [sic], so I called him aside and told him that I don't like

---

[3] A "clamp truck" is "like[] a forklift, but it has paddles on the side and it clamps the merchandise and lifts it up and brings it down instead of lifting from the bottom." (Pl.'s Dep. 86:12-17.) A "good clamp truck" "are small . . . [and] newer compared to the big old clamp trucks . . . [t]he newer [clamp trucks] r[a]n better and worked better" than the "big old clamp trucks." (*Id.* 86:21-87:3.)

[4] Although it is not particularly clear from her deposition, "they" means Mr. Fine in connection with another Material Handler named "Kevin." (*Id.* 89:14-19.)

>stuff like that.  Now I don't want such ugly words to be spoken to me nor do I want to be harassed at any time after I turn this paper in to you.

(Def.'s SMF, Ex. B, Lane 15.)

After Plaintiff made her complaint, Mr. Battagliotti contacted Rachel Byers, an Area Human Resources Manager.  (Def.'s SMF ¶ 47.)  Mr Battagliotti also sent Ms. Byers a copy of Plaintiff's written complaint.  (*Id.* ¶ 48.)  On July 8, 2010, Ms. Byers opened an investigation into Plaintiff's complaint.  (*Id.* ¶ 52.)  And on July 13, 2010, Ms. Byers interviewed Mr. Fine in person at the Swedesboro facility, as well as two other employees, Donia Robinson and John Conway.  (*Id.* ¶¶ 53.)  Although Plaintiff stated that these employees witnessed one of Mr. Fine's inappropriate comments, neither Ms. Robinson nor Mr. Conway could recall an incident involving Mr. Fine and Plaintiff.  (*Id.* ¶¶ 54-55.)  Mr. Fine even testified that he was not aware that Ms. Byers investigation and interview of him had anything to do with the Plaintiff; rather, he believed that her interview was about his use of "foul language."[5]  At the time Ms. Byers was conducting her investigation, Plaintiff was on a leave of absence and Ms. Byers did not interview her.  (Deposition of Rachel Byers 23:9-12, Apr. 29, 2013.)  Based on her investigation, Ms. Byers subsequently concluded that Plaintiff's allegations were unsubstantiated.  (Byers Dep. 29:8-11.)  However, after her complaints, Plaintiff was moved from the third shift to the second shift where she was told not to have any contact with Mr. Fine.  (Pl.'s Dep. 91:23-24.)

From approximately October 2010 until early April 2011, Plaintiff was on another leave of absence due to a serious health condition.  (Def.'s SMF ¶ 60; Pl.'s Dep. 160:6-163:6.)  While Plaintiff was out on leave, however, she spoke with Latanya Ezell, a Human Resources representative, and complained that "she had been cursed at, talked down to, and discriminated

---

[5] There is other evidence in the record, however, that contradicts Mr. Fine's statement.  (*See* Deposition of Louis Fine 23:3-12, Dec. 4, 2012; Pl.'s SMF, Ex. D (Email from V. Battagliotti to R. Byers, July 7, 2010); Def.'s SMF, Ex. E, Byers 7 at S 0289.)

4

against." (Def.'s SMF ¶ 61; Ex. E, Byers 6.)  In her complaint to Ms. Ezell, Plaintiff reiterated that Mr. Fine had allegedly stated "you better be fucking doing those papers right," and asserted that Mr. Fine made a reference to male genitals. (*Id.* ¶ 62; Ex. E, Byers 6.)  In response to an email sent by Ms. Ezell to Ms. Byers, Ms. Byers responded that "[t]he first incident was investigated . . . and found to be inconclusive." (Ex. E, Byers 6.)  She then stated: "[w]e'll need to fully investigate." (*Id.*)  However, Plaintiff was never informed or made aware that Sears had actually conducted any investigation into her complaints. (Pl.'s Dep. 179:2-5.)  It is also unclear whether the second investigation was ever concluded. (Pl.'s SF ¶ 38; Def.'s Reply SMF ¶ 38.)

When Plaintiff returned to work in April 2011, she was on light duty.  However, at the end of April, Plaintiff went on another leave of absence. (Pl.'s Dep. 164:4-7.)  When she returned to work on October 1, 2011, she was placed on the second shift. (*Id.* 167:21-168:6.)  Subsequently, sometime in either late 2011, or early 2012, Plaintiff stopped reporting to work. (*Id.* 172:2-9; 205:3-16.)  That following summer, when contacted by an employee in Sears' Human Resources group as to whether she would be returning to work, Plaintiff responded that she would not and would be resigning because of stress and her illness, multiple sclerosis. (*Id.* 51:22-52:7.)  Plaintiff testified that if it had not been for the stress and pressure at work, she would not have experienced "flare ups" associated with her multiple sclerosis, which resulted in hospitalization. (*Id.* 207:6-16.)

On August 25, 2011, Plaintiff filed suit against the Defendant in the Superior Court of New Jersey, Camden.  Plaintiff claimed that she was subjected to various acts of sexual harassment by one of Defendant's supervisors, and that these acts were "regular and pervasive in nature," thus creating a hostile work environment. (Doc. No. 1, Compl. ¶ 3.)  Plaintiff further

5

alleged that Defendant failed to conduct an adequate investigation or otherwise abate the hostile work environment.  (*Id.* ¶¶ 4-5.)

On October 19, 2011, Defendant filed a notice of removal pursuant to 28 U.S.C. § 1441, invoking this Court's jurisdiction under 28 U.S.C. § 1332(a).  On October 25, 2011, Defendant answered Plaintiff's Complaint, and, after the close of discovery, Defendant filed its motion for summary judgment on June 21, 2013.  (Doc. No. 17.)

As this motion is fully briefed, the Court now turns to the parties' arguments.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x. 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder, not the district court. *BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**B. Sexual Harassment Hostile Work Environment Claims Under the NJLAD**

As the New Jersey Supreme Court has long recognized, "New Jersey has a strong interest in maintaining 'discrimination-free workplace[s]' for workers." *Cutler v. Dorn*, 955 A.2d 917, 923 (N.J. 2008) (citing *Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 452 (N.J. 1993)). Accordingly, the NJLAD makes it an unlawful

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex . . . of any individual, . . . to refuse to hire or employ or to bar or to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

7

*Lehmann*, 626 A.2d at 452 (citing N.J. Stat. Ann.. § 10:5–12(a)).

Plaintiffs claiming a hostile workplace based on acts of sexual harassment, must prove that

> the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.

*Cutler*, 955 A.2d at 924 (citing *Lehmann*, 626 A.2d at 453).

When evaluating hostile work environment claims, courts should consider the "totality of the circumstances," rather than "individual incidents." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482-84 (3d Cir. 1990). Courts may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Feraro-Bengle v. Randstad North Am., L.P.*, 2006 WL 2524170, at *4 (D.N.J. Aug. 30, 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (internal quotation marks omitted)). Offhanded comments and isolated incidents are insufficient to sustain a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). And "speculations, generalities, and gut feelings, however genuine, do not permit an inference of discrimination to be drawn." *Chambers v. Heidelberg USA, Inc.*, No. 04-583, 2006 WL 1281308, at *6 (D.N.J. May 5, 2006) (citation omitted).

### III.   ANALYSIS

Defendant argues that summary judgment is appropriate in this case because: (1) Plaintiff has failed to establish that the complained of conduct was because of any protected category; (2) She has failed to offer any evidence, aside from her own uncorroborated assertions, that establishes the existence of any severe, pervasive, or extreme conduct based upon her gender

that altered the terms or conditions of her employment with Defendant; and (3) Defendant exercised reasonable care to prevent and correct the alleged harassing behavior.

Although Defendant argues that Plaintiff has failed to establish her claim such that summary judgment is appropriate, the Court disagrees. Based on the record before the Court it appears that there is a clear factual dispute as to whether Mr. Fine even engaged in the conduct forming the basis for Plaintiff's suit, let alone whether that conduct was severe and pervasive.

Illustratively, Plaintiff testified that Mr. Fine poked her in the upper chest area prior to the time that she complained to Mr. Battagliotti. (Pl.'s Dep. 124:1-6.) However, Mr. Fine testified that he never poked Plaintiff. (Fine Dep. 44:19-20.) Plaintiff also testified that Mr. Fine told her to "sit on my face." (Pl.'s Dep. 99:14-100:4.) Again, however, Mr. Fine testified to the contrary. (Fine Dep. 45:7-8.) Indeed, for each of Plaintiff's allegations regarding Mr. Fine's conduct, there is a contradictory assertion in Mr. Fine's deposition testimony.[6] Additionally, certain documentary evidence in the record supports Plaintiff's allegations. (Pl.'s SF, Ex. D (Email from Mr. Battagliotti to Ms. Byers stating that he had to suspend Mr. Fine due to insubordination and that he talked to him "about the statement I received from an associate about his language and the way he talks to associates on his shift . . . [Mr. Fine] said he didn't say it, but I believe he did"); Def.'s Ex. E, Byers 6 (Ms. Byers noting on an "Investigation Form" that "Lou Fine was previously suspended without pay and understands that was disciplinary action for comments made to Joan Lane").

---

[6] As to Defendant's argument that Plaintiff cannot rely on her own testimony in order to support her hostile work environment claim, depositions are listed in Fed. R. Civ. P. 56(c)(1)(A) as one of several materials that may be cited to assert that a fact is genuinely disputed. The rule makes no distinction as to the weight to be afforded to a plaintiff's own testimony as compared to the testimony of others. *See Socoloski v. Sears Holding Corp.*, No. 11-3508, 2012 WL 3155523, at *6 n.5 (E.D. Pa. Aug. 3, 2012) (holding that plaintiff's testimony alleging that certain supervisors "made various age-specific discriminatory comments directed toward Plaintiff on multiple occasions" was sufficient to establish that defendants' proffered reason for firing plaintiff was pretextual).

Further, Plaintiff has raised an issue of material fact as to whether the complained-of conduct and offensive remarks would have occurred but for the fact that she is a woman. The derogatory language she alleges rises above mere incivility, *see Herman v. Coastal Corp.*, 791 A.2d 238 (N.J. Super. Ct. App. Div. 2002), and some of the conduct alleged was sexual in nature. Defendant contends that a number of the comments Plaintiff identified did not implicate her gender, e.g., Mr. Fine's comment that she "better fucking do them papers right," however, based on Plaintiff's other allegations, the fact that she was the only female Material Handler on the floor, and viewing the facts in the light most favorable to Plaintiff, the Court does not accept Defendant's argument that the alleged harassment was not based on Plaintiff's gender.[7]

Finally, for the reasons set forth above, Plaintiff has raised a material dispute of fact as to whether a reasonable woman would believe that the conditions of employment were altered and that a hostile or abusive working environment existed.

Based on the foregoing, the Court holds that Defendant's arguments do not justify summary judgment at this time.

1. *Defendant's Liability as Plaintiff's Employer*

Even though there is a triable issue of fact regarding Plaintiff's claim of hostile work environment, the Court must still inquire as to whether Defendant can be held vicariously liable for the conduct of one of its employees.

---

[7] Defendant also notes that for a number of Plaintiff's allegations, she was not sure whether she specifically reported the conduct to Mr. Battagliotti, or whether she included it in her report. (*See* Pl.'s Dep. 85:13-21; 101:10-102:14; 123:1-124:14.) However, Plaintiff's report, dated July 1, 2010, provides:

> '[t]here has been other stuff said about 2 months ago when the temporal workers were here, [Louis Fine] said some real slick stuff to me in front of the temporal worker {that oh she want your body} I wasso embarrass [sic], so I called him aside and told him that I don't like stuff like that. Now I don't want such ugly words to be spoken to me nor do I want to be harassed at any time after I turn this paper in to you.

(Def.'s SMF, Ex. B, Lane 15.) Although "real slick stuff" might be Plaintiff's attempt to reference some of Mr. Fine's other remarks, this type of inquiry is properly reserved for the jury, along with any credibility determination as to Plaintiff's or Mr. Fine's account of the events at issue.

Plaintiff argues that Defendant is vicariously liable for her Mr. Fine's conduct because he was her supervisor. Alternatively, she argues that Defendant liable for its own negligent conduct in failing to remediate her situation. (Pl.'s Opp'n Br. 7-12.) As discussed above, Defendant counters that it exercised reasonable care to prevent and correct the alleged harassing behavior such that it cannot be held vicariously liable, and that because Plaintiff did not complain to Defendant about the majority of the assertions she now raises, she unreasonably failed to take advantage of any preventative or corrective opportunities provided by Defendant. (Def.'s Br. 35-36.) In its Reply Brief, Defendant argues for the first time that Mr. Fine is a not a supervisor such that it can be held vicariously liable for his conduct.

### a. Whether Mr. Fine Qualifies as a Supervisor

An employer's liability under the NJLAD for claims related to sexual harassment by a supervisor is largely dependent upon the facts of a particular case. *Lehmann*, 626 A.2d at 464. Generally, an employer can be held vicariously liable for the conduct of a supervisor where the supervisor acted within the scope of his or her employment. *Id.* Additionally, in the more common situation where the supervisor acted outside the scope of his or her employment, the employer can be held vicariously liable "if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship." *Id.*; *see also Herman v. Coastal Corp.*, 791 A.2d 238, 251 (explaining that an employer cannot be held liable for sexual harassment under the NJLAD "in the absence of a showing that the harassing employee was acting within the scope of his employment, or that the employer was negligent, or had intended the conduct.")

Thus, as explained by the New Jersey Supreme Court in *Lehmann*, "an employer can be held liable for compensatory damages stemming from a supervisor's creation of a hostile work environment" in one of three circumstances: (1) where "the employer grants the supervisor the authority to control the working environment and the supervisor abuses that authority to create a hostile work environment[;]" or (2) where "the employer ha[s] actual or constructive notice of the harassment[;]" or (3) where, in the absence of actual or constructive notice, "the employer negligently or recklessly failed to have an explicit policy that bans sexual harassment and that provides an effective procedure for the prompt investigation and remediation of such claims." 626 A.2d at 464.

"A supervisor has a unique role in shaping the work environment. Part of a supervisor's responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the workplace." *Herman*, 791 A.2d at 252. Determining precisely which employees qualify as supervisors "for purposes of vicarious liability for compensatory damages" depends upon the "functional assignments" those employees maintain in the workplace. *Cavuoti v. New Jersey Transit Corp.*, 735 A.2d 548, 558 (N.J. 1999). Moreover, the use of "a mere title of 'manager' or 'supervisor' does not by itself suffice to impute that employee's knowledge or actions to the employer." *Id.* at 557-58. Putting aside arbitrary position titles utilized by any given employer then, generally "a supervisor has the authority to hire, fire, discipline, control employees' wages or control employees' schedules." *Herman*, 791 A.2d at 254 (citing *Cavuoti*, 735 A.2d at 558); *see also Entrot v. BASF Corp.*, 819 A.2d 447, 459 (N.J. Super. Ct. App. Div. 2003) (relevant factors in determine whether an employee qualifies as a supervisor include the power to fire or demote, the power to direct job functions, and any evidence that the alleged harasser possessed influence to

control the workplace or restrict the alleged victim's freedom to ignore the complained-of conduct).

As recognized by New Jersey courts, "[a]n employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor 'to control the day-to-day working environment' facilitates harassing conduct." *Herman*, 791 A.2d at 254 (citation omitted); *see also Lehmann*, 626 A.2d at 462. Indeed, the Court must consider "whether the power the offending employee possessed was reasonably perceived by the victim, accurately or not, as giving that employee the power to adversely affect the victim's working life." *Entrot*, 819 A.2d at 459.

Here, a review of the record reveals that there is a genuine dispute as to whether Mr. Fine was Plaintiff's supervisor.

Plaintiff argues that Mr. Fine was a supervisor who controlled her day-to-day activities and that he himself admitted that he was her supervisor and directed her daily tasks and day-to-day working environment. (Pl.'s SF ¶ 61; Fine Dep. 19:20-20:3 (Q. "Do you have keys to the place? A. Yes. Q. Why? A. 'Cause I'm a supervisor. I'm a lead . . . Q. So how many people under your supervision as a lead, as you've indicated, in and about the time frame that Joan Lane worked there . . . ? A. On . . . one night. There might have been more, but there's probably six a night there"); 20:17-21 ("Q. Okay. So you would assign people duties and tasks . . . . A. Yes"); 27:6-28:19 (indicating that it was part of his job to provide input to management related to employees' performance and performance issues).)

Additionally, Ms. Byers testified that it was her understanding that Plaintiff felt harassed by a "member of management." (Pl.'s SF ¶ 28; Byers Dep. 9:6-10). And that Mr. Fine managed Plaintiff's day-today activities. (Byers Dep. 59:24-60:1.) Further, portions of Mr. Battagliotti's

13

testimony also support Plaintiff's claim. (*See* Deposition of Victor Battagliotti 31:20-24, Feb. 18, 2013 (confirming that Mr. Fine was responsible for assigning tasks to the six employees he supervised); 42:9-43:5 (explaining that supervisors control their shifts and are responsible for workflow); 43:6-44:2 (agreeing that it was expected that associates would follow the leads and supervisors and their instructions and that there was a chain of command); 44:3-10 (confirming that if an associate failed to follow an instruction from a lead or a supervisor, he or she could be subject to discipline).)

There is some evidence that Mr. Fine was not consulted in connection with any disciplinary actions. (*See* Fine Dep. 28:20-24.) And that he did not hire or fire employees. (Byers Dep. 59:24-60:1.) Additionally, in further support of its argument that Mr. Fine does not qualify as a supervisor, Defendant offers a verified statement from Mr. Fine in connection with its reply in further support of its motion for summary judgment. (Def.'s Reply Br., Ex. FF.) This statement appears to be an attempt to contradict any evidence previously submitted that would have supported a conclusion that Mr. Fine qualified as a supervisor. Indeed, in this document, Mr. Fine states (in conclusory fashion) that he did not have the authority to hire, fire, promote or demote employees, nor did have the authority to make significant changes to the duties and responsibilities of material handlers, and he did not have the authority to make decisions that cause significant changes in employees' benefits.[8] (*Id.*)

In light of this contradictory evidence, there is a genuine dispute of material fact as to whether Mr. Fine's control over Plaintiff's day-to-day tasks were sufficient to find that he had influence to control the work place and whether his power was reasonably perceived by Plaintiff as giving him the power to adversely affect her working life, and thus qualified as Plaintiff's supervisor. Accordingly, summary judgment is inappropriate at this time.

---

[8] Although there are a few more statements on the second page of this document, they are illegible.

> b. *Maintenance of an Anti-Harassment Policy*

As an alternative basis for liability, Plaintiff argues that Defendant is directly liable for its failure to implement an effective anti-harassment policy and its failure to implement any effective remedial measure in response to Plaintiff's complaints. (Pl.'s Opp'n Br. 10-11.) Chief among her concerns is the fact that she was cut out of Defendants' investigative process. (*Id.* 11.) Defendant argues that its dissemination of an effective anti-harassment policy provides compelling proof that an employer has exercised reasonable care to prevent and promptly correct harassment and serves as a defense to liability. (Def.'s Br. 35.) And that Plaintiff failed to take advantage of Defendant's preventative or corrective opportunities. (*Id.* at 36.)

Under New Jersey law, courts "adhere to the principle that if an employer has exercised due care in acting to prevent a sexually discriminatory hostile work environment, vicarious liability should not attach. The establishment of an effective anti-sexual harassment workplace policy and complaint mechanism evidences an employer's due care and may provide affirmative protection from vicarious liability." *Gaines v. Bellino*, 801 A.2d 322, 323 (N.J. 2002); *see also Cavuoti*, 735 A.2d at 556 (recognizing that New Jersey law "afford[s] a form of a safe haven [from vicarious liability for the harassing conduct of an employee] for employers who promulgate and support an active, anti-harassment policy.")

In order for an employer to enjoy the benefit of that safe haven from vicarious liability based on maintaining an active anti-harassment policy, the following circumstances are "relevant: periodic publication of the employer's anti-harassment policy, the presence of an effective and practical grievance process for employees to use, and training for workers, supervisors, and managers concerning how to recognize and eradicate unlawful harassment." *Gaines*, 801 A.2d at 330 (citing *Cavuoti*, 735 A.2d at 556).

Additionally, "[a]n employer has a clear duty not only to take strong and aggressive measures to prevent invidious harassment, but also to correct and remediate promptly such conduct when it occurs." *Herman*, 791 A.2d at 252 (citing *Payton v. New Jersey Turnpike Auth.*, 691 A.2d 321, 327-28 (N.J. 1997)). As the New Jersey Supreme Court noted in *Gaines*, "[t]he efficacy of an employer's remedial program is highly pertinent to an employer's defense" that its actions absolve it from all liability for a plaintiff's claims. 801 A.2d at 330 (citing *Payton*, 691 A.2d at 327). "'[E]ffective' remedial measures . . . include the process by which the employer arrives at the sanctions that it imposes on the alleged harasser" and are reviewed in light of the "investigation—including [its] timeliness, thoroughness, [the] attitude toward the allegedly harassed employee, and the like—as well as by the result[.]" *Payton*, 691 A.2d at 327.

Here, it is undisputed that Defendant maintained an anti-harassment policy that was subject to periodic publication and made available to Plaintiff, (Pl.'s Dep. 60:2-63:15; Ex. B, Lane 4), and that the policy provided for multiple reporting methods, as well as a toll free hotline, for associates who believe that improper conduct has occurred. (Def.'s SMF ¶¶ 10-11; Pl.'s Dep. 61:7-63:5; Ex. B, Lane 3.)

Plaintiff made use of the complaint mechanisms available to her but argues that the investigative process was inadequate, i.e., that the efficacy of the remedial measures taken by Defendant were lacking. Although there is no dispute that investigations were opened in response to Plaintiff's complaints, she was never interviewed in connection with those investigations. Additionally, there seems to be contradictory evidence as to whether Mr. Fine was actually disciplined for his alleged conduct toward Plaintiff, or for unrelated subordination due to his penchant for wearing shorts to work and using "foul language." (*Compare* Fine Dep. 23:15-18, *with* Def.'s Ex. E, Byers 6 (form prepared and signed by Ms. Byers, but not by Mr.

16

Fine, stating that "Lou Fine was previously suspended without pay and understands that was disciplinary action for comments made to Joan Lane") Further, although Defendant's Code of Conduct states that the Sensitive Investigations Committee, charged with investigating complaints that involve, *inter alia*, "conduct of officers," shall be required to "conduct effective investigations of Sensitive Complaints," it does not define what makes an investigation effective nor provide for any investigative procedures.  (D. Ex. B, Lane 3 at 15.)  A reasonable trier of fact may well conclude that simply requiring that investigations be effective—certainly a nod to the standard articulated in the case law—without conducting those investigations in an effective manner, does little to support the assertion that the policy itself precludes liability.

Finally, although Defendant argues that Plaintiff failed to report certain of Mr. Fine's conduct, there is conflicting evidence in the record as to what was exactly reported and when.

Accordingly, because a reasonable jury could conclude that Defendant's failure to interview Plaintiff, along with the contradictory evidence as to whether Mr. Fine was actually interviewed or disciplined as a result of Plaintiff's complaints, constituted a failure to implement "effective" remedial measures, the Court will deny Defendant's motion for summary judgment on Plaintiff's hostile work environment claim.

### C. Plaintiff's Claim for Punitive Damages

Finally, under NJLAD, an employer can be liable for punitive damages "only in the event of actual participation by upper management or willful indifference." *Santiago v. City of Vineland*, 107 F. Supp. 2d 512, 569 (D.N.J. 2000) (internal quotation marks and citations omitted).  Based on the record before the Court, no reasonable jury could conclude that Defendant actually participated in the conduct of which Plaintiff complains or that it was willfully indifferent to Mr. Fine's wrongdoing.  Although, as discussed above, Defendant may be

found to be vicariously liable for Mr. Fine's actions and thus subject to compensatory damages, Plaintiff has failed to raise a triable issue of fact that its conduct rose to the level required for the imposition of punitive damages. Accordingly, this claim will be dismissed.

## IV. CONCLUSION

For the reasons stated above, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment. An appropriate order shall issue today.

Dated: 3/31/2014                                             s/ Robert B. Kugler
                                                                         ROBERT B. KUGLER
                                                                         United States District Judge